UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| DAWN M. WARREN, | ) | |
| (Social Security No. XXX-XX-2989), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:09-cv-17-WGH-DFH |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 8,

13) and an Order of Reference entered by District Judge Richard L. Young on May

8, 2009 (Docket No. 18).

**I.  Statement of the Case**

Plaintiff, Dawn Warren, seeks judicial review of the final decision of the

agency, which found her not disabled and, therefore, not entitled to Disability

Insurance Benefits ("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§

416(i), 423(d); 20 C.F.R. § 404.1520(f).  This court has jurisdiction over this action

pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on October 31, 2005, alleging disability since

January 21, 2005.[1]  (R. 46-48).  The agency denied Plaintiff's application both

---

[1]Plaintiff amended her onset date to May 29, 2005.  (R. 9).

initially and on reconsideration.  (R. 27-34).  Plaintiff appeared and testified at a hearing before Administrative Law Judge Augustus C. Matin ("ALJ") on September 5, 2008.  (R. 458-98).  Plaintiff was represented by an attorney; also testifying was a vocational expert.  (R. 498).  On September 25, 2008, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 9-19).  The Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 2-4).  20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on February 13, 2009, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 36 years old at the time of the ALJ's decision and had a high school education.  (R. 18).  Her past relevant work experience included work as a counter attendant, cashier/clerk, line worker, tax preparer, deck hand, dealer, and CNA, each of which either exceeded light work or was skilled/semi-skilled. (R. 20).

### B.  Medical Evidence

#### 1.  Plaintiff's Physical Impairments

Plaintiff visited the St. Mary's Medical Center emergency room on March 28, 2004, after an automobile accident.  (R. 340-41).  X-rays of Plaintiff's left shoulder

showed no fracture.  (R. 341).  Jacob Kennedy, M.D., assessed cervical strain and a left shoulder contusion.  (R. 341).

Shortly thereafter, Plaintiff began treatment with Michael J. McFadden, M.D., and continued to show improvement until October 27, 2004, when she reported to him that she had experienced an increase in pain.  As a result, Dr. McFadden administered injections into her shoulder and stated that if the pain persisted, he would recommend that she get an MRI to rule out internal derangement of the left shoulder.  (R. 412).

On January 4, 2005, Plaintiff was evaluated at Tri-State Orthopaedic Surgeons by Paul Perry, M.D., for complaints of left shoulder pain.  (R. 395). Plaintiff had AC synovitis in her left shoulder and a recent MRI revealed a likely labral tear.  (R. 395).  The treatment she had received from Dr. McFadden – including physical therapy, a TENS Unit, and various medications – had failed to relieve her pain.  (R. 395).  Dr. Perry recommended that she undergo surgeries, including a diagnostic shoulder arthroscopy with arthroscopic acromioplasty and arthroscopic partial distal clavicle excision (Mumford Procedure).  (R. 395).  In a follow-up visit on February 8, 2005, Dr. Perry noted that Plaintiff was essentially normal following the surgery but still complained of a lot of pain.  (R. 415).

On May 16, 2005, Donald R. Brake, Jr., M.D., noted that Plaintiff could only raise her left shoulder about 90 degrees and that it was too painful to go beyond that.  He further stated that Plaintiff could not externally rotate her left arm

secondary to discomfort, that she had a decreased range of motion, and that there
was popping in the left shoulder.  (R. 249).

On June 10, 2005, Plaintiff saw Dr. Brake for complaints of shoulder pain
after her automobile accident.  (R. 251-52).  Plaintiff had a collarbone fracture and
history of adhesive capsulitis.  (R. 251).  Plaintiff had a significantly limited range
of motion in her left shoulder; she could only abduct to 90 degrees before feeling
pain.  Dr. Brake further stated that it was very difficult for Plaintiff to lift anything
over her head, much less sustain the range of motion and strength in her left
shoulder.  (R. 251).

Left shoulder x-rays taken on June 14, 2005, showed postsurgical changes
(R. 352), and an MRI of the left shoulder showed changes in the distal clavicle
because of a previous fracture or previous surgery (R. 354).

Randall L. Oliver, M.D., examined Plaintiff on January 6, 2006, at the
request of the state agency.  (R. 297-301).  Plaintiff alleged disability due to mental
stress, memory loss, and problems with her left arm, all as a result of the March
2004 automobile accident.  (R. 297).  Plaintiff complained of blurred vision,
vertigo, hearing voices, and sinus pain.  (R. 298).  Plaintiff had a normal gait, and
she had no problems standing on her heels and toes, squatting, or hopping.  She
did, however, have some edema in her ankles.  (R. 300).  Her tandem walk was
unsteady.  (R. 300).  Muscle strength in the left upper extremity was only 1/5, but
strength in all other extremities was normal, and there was no muscle spasm or
atrophy.  (R. 300).  Reflexes were 0/4 and grip strength was 1/5 in the left upper

extremity, sensation in the left lower leg was decreased, and fine finger manipulative abilities were intact.  (R. 300).  Plaintiff displayed reduced left shoulder abduction and adduction, but forward elevation, internal rotation, and external rotation were normal.  (R. 302).

Tricia Baird, M.D., saw Plaintiff on February 27, 2007.  (R. 241).  Dr. Baird noted that it was difficult to interview Plaintiff.  (R. 241).  On March 26, 2007, Dr. Baird noted Plaintiff's counselor encouraged her to walk more, and Plaintiff was taking care of her mother's dog because her mother was overwhelmed.  (R. 239).  On August 8, 2007, Plaintiff told Dr. Baird she was using three Norco[2] tablets a day in order to help her cope with erecting a tent at a church revival; this was causing her more pain.  (R. 235).

A December 2007 MRI of Plaintiff's cervical and lumbar spine was normal.  (R. 222).  A December 2007 MRI of the left shoulder showed a widening of the AC joint and old posttraumatic/postoperative changes in the adjacent bone.  (R. 223).

When Plaintiff was examined by Dianne Crowley, M.D., on January 29, 2008, her assessment included headache, low back syndrome, cervicalgia, intervertebral disc disorder of lumbar region with myelopathy, displacement of cervical intervertebral disc without myelopathy, sciatic neuralgia, low back syndrome, lumbar disc displacement, and other symptoms referable to the back.

---

[2]Norco is a narcotic pain medication that is used to treat moderate to severe pain.

Dr. Crowley treated these conditions with Percocet, continuing Lortab, and by administering a lumbar facet block injection.  (R. 209-10).

On February 8, 2008, Plaintiff was seen by Dr. Crowley with complaints of headaches, left shoulder pain, and low back pain.  (R. 198-99).  Her headaches would occur several times a week and led to dizziness, nausea, and photophobia, and were getting progressively worse.  (R. 198).  Plaintiff's left upper extremity displayed general weakness, a grip strength of 3/5, and decreased range of motion in her left shoulder.  (R. 199).

On March 21, 2008, Plaintiff had left shoulder pain that was exaggerated when lifting at and above shoulder level.  (R. 183).  She indicated some relief from a facet injection, but was waiting for another injection because the pain returned. (R. 183).

An April 9, 2008 MRI of the knees was normal.  (R. 224).

On July 7, 2008, Plaintiff was seen by Steve Griffith, M.D., complaining that the pain in her upper back was an eight out of ten.  As a result, Dr. Griffith stated that she needed to start neck traction for two weeks, three times per week.  (R. 156-57).  On July 14, 2008, Dr. Griffith examined Plaintiff for complaints of lumbar and thoracic pain that radiated into both arms.  (R. 153).  She had normal reflexes and sensation, normal gait, and no strength deficits.  (R. 153).  Bilateral straight leg raising was normal, and range of motion of the extremities and cervical spine was normal.  (R. 153).

On August 2, 2008, Dr. Baird completed a form assessing Plaintiff's ability to do physical work activities.  (R. 111).  Dr. Baird opined that Plaintiff could stand and walk three hours each in an eight-hour workday, for 20 to 40 minutes at a time; sit four hours a day; lift/carry less than ten pounds consistently; take off work three days a month because of medical problems; and always be able to stay focused despite pain, side effects of medication, and psychiatric problems such as crying spells.  (R. 111).

### 2.  Plaintiff's Mental Impairments

Joy Baker, Ph. D., performed a psychological examination of Plaintiff on December 15, 2005.  (R. 330-36).  Dr. Baker noted Plaintiff was difficult to interview, she rambled, and she did not stick to the topic.  (R. 331).  Weschler memory testing revealed extremely low results.  (R. 333).  Plaintiff was agitated, her speech was pressured but clear, and she rambled.  (R. 334).  Plaintiff did not answer direct questions.  (R. 334).  Plaintiff appeared paranoid and delusional, but she was oriented.  (R. 334-35).  From her examination, Dr. Baker diagnosed Plaintiff with schizoaffective disorder, paranoid and somatic delusions, auditory hallucinations, depressive episodes, diminished interest or pleasure in all or almost all activities most of the day nearly every day, insomnia, psychomotor agitation, fatigue, recurrent suicidal ideation without a specific plan, dementia, memory impairment, and disturbance in executive functioning.  (R. 335).  Dr.

Baker assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 30.[3] (R. 336). Dr. Baker concluded: "Plaintiff is confined to her home by her mental and emotional problems. She lacks motivation to work, she does not want to be around people, she is extremely paranoid and would not get along with supervisors, co-workers, or customers. She is so confused, she would not be able to remember instructions and carry them out." (R. 335-36).

Plaintiff underwent a psychiatric assessment at Southwestern Indiana Mental Health Center on July 11, 2006, with therapist Anna Fink, MSW. She was referred to the therapist by her treating physician, Dr. Brake, because of severe depression and anxiety. Plaintiff was appropriate, friendly, her affect was mildly depressed, and her thought processes were logical, sequential, relevant and spontaneous. (R. 121). She had no unusual thought content, no hallucinations, and no delusions. (R. 121). Plaintiff was oriented and her memory was intact. (R. 121). The therapist diagnosed dysthymic disorder and generalized anxiety disorder, assigning a GAF score of 45.[4] (R. 121-22).

On August 25, 2006, plaintiff underwent a psychiatric evaluation by John Wuertz, M.D., at Southwestern Indiana Mental Health Center. (R. 119-20). Plaintiff reported a long history of depression and anxiety, with problems

---

[3] A GAF score of 21-30 indicates that either: (1) an individual's behavior is considerably influenced by delusions or hallucinations; (2) there is a serious impairment in judgment or communication; or (3) there is an inability to function in all areas.

[4] A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

controlling her temper at times.  She reported that she often hears voices and noises and sometimes will catch something out of the corner of her eye, but upon looking, nothing is actually there.  (R. 119).  Furthermore, Dr. Wuertz found that she would often have paranoid thoughts.  Plaintiff also overdosed in the past and cut herself.  (R. 119).  Dr. Wuertz's diagnosis was that of major depressive disorder, recurrent, with psychotic features, panic disorder with agoraphobia, anxiety disorder NOS, and he assigned a GAF score of 35.[5]  Dr. Wuertz asked her to return for a follow-up in six weeks.  (R. 119-20).

Plaintiff visited Dr. Wuertz again on October 11, 2006, and complained of medication side effects; she felt sedated and tired, so he changed her medication. (R. 118).  Plaintiff was paranoid, heard voices, and felt depressed, but did not have suicidal thoughts.  (R. 118).  On November 22, 2006, Plaintiff told Dr. Wuertz that she was doing somewhat better and felt less depressed.  (R. 181).  She denied suicidal thoughts, but she had paranoid thoughts, and at times heard voices.  Dr. Wuertz could not ascertain whether the Paxil was sedating.  (R. 118).

On April 25, 2007, Plaintiff told Dr. Wuertz during a psychiatric interview that she was not depressed, had not had a panic attack in a month, infrequently heard voices, and had no paranoid thoughts.  (R. 117).  On June 8, 2007, Plaintiff reported problems with her 17-year-old son who hits her 13-year-old autistic son

---

[5]A GAF score of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

in the head.  (R. 117).  Plaintiff reported being depressed, and she was having suicidal thoughts.  (R. 117).

On August 10, 2007, Plaintiff visited Dr. Wuertz and was depressed, heard voices, had panic attacks, and had suicidal thoughts.  (R. 116).  On September 21, 2007, Plaintiff reported calling the police on her 17-year-old son.  (R. 115).  She further reported having almost daily panic attacks, hearing voices, and having suicidal thoughts.  (R. 115).  On November 7, 2007, Plaintiff was depressed, had difficulty sleeping, heard voices, and had suicidal thoughts.  (R. 115).

On December 19, 2007, Plaintiff visited Dr. Wuertz again for a psychiatric interview and was "doing pretty good," did not feel depressed, and had a good affect.  (R. 114).  She was only having paranoid thoughts while she was by herself. (R. 114).  In February 2008, Plaintiff did not have significant depression, she had mild panicky feelings, she denied suicidal thoughts, but she heard voices.  (R. 114).  Her affect was good.  (R. 114).  Plaintiff visited Dr. Wuertz again on April 23, 2008.  (R. 113).  Plaintiff stated she was depressed, she had suicidal thoughts, and she heard voices.  She was also having difficulty sleeping at night, and was only getting four hours of sleep.  (R. 113).

### 3.  State Agency Review

On January 4, 2006, Dr. J. Gange, a non-examining, state agency consultant, completed a mental RFC form.  (R. 312-14).  Plaintiff's ability to understand, remember, and carry out detailed instructions was moderately limited; her ability to maintain attention and concentration for extended periods

was also moderately limited.  (R. 312).  Plaintiff also had a moderately limited ability to act appropriately with the general public, to respond appropriately to changes in the work setting, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (R. 312-13).  Dr. Gange opined that Plaintiff's impairments may interfere with complex task completion but would allow for the completion of simple, repetitive tasks.  (R. 314).  Dr. Gange concluded that these limitations resulted in Plaintiff having mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in concentration, persistence, or pace, and no episodes of decompensation for extended periods.  (R. 326).  Dr. W. Shipley, another state agency psychologist, reviewed Plaintiff's record in June 2006, and agreed with Dr. Gange's assessment.  (R. 314).

A physical RFC form completed on April 6, 2006, by non-examining, state agency consultant Dr. J. Corcoran, showed the following:  that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry ten pounds, could stand or walk about six hours of an eight hour work day, sit with normal breaks for a total of about six hours in an eight hour work day, and that pushing and/or pulling was limited in her upper extremities.  As a result of the injuries in her left arm, Dr. Corcoran imposed a left upper extremity limitation of lifting ten pounds, both occasionally and frequently, with no pushing or pulling.  (R. 272-79).  To support his conclusions, Dr. Corcoran cites to the January 13, 2006 consultative exam with Dr. Oliver which found a decreased range of motion in Plaintiff's left

shoulder to 75 degrees of abduction and 15 degrees of adduction.  Dr. Corcoran then checked a box stating that Plaintiff has no limitations reaching in all directions including overhead.  (R. 273-75).

### 4.  Plaintiff's Testimony

Plaintiff testified that she stopped working in May 2005, when her doctor told her that repetitive motions were aggravating her injuries, and each task she tried at work caused those aggravations.  Additionally, she stated that she could not stay on task and had a lot of anger problems.  (R. 470).  Plaintiff suffers from pain in her back, head, neck, shoulders, and legs.  She frequently wears a back brace to help control the pain, but it does not provide complete relief.  (R. 477-78).  Frequent movement of her right arm causes pain, and she experiences both pain and popping in her left arm.  The pain was treated with Lortabs, Oxycontin, and prescription lotion and patches, causing her to feel sedated.  (R. 479-80).  Plaintiff also testified that she uses a TENS Unit, but her pain has worsened over the past year.  (R. 480-81).

Mentally, Plaintiff testified that she has suicidal thoughts and that it is hard for her to stay focused and keep her mind on things, that she gets irritated and angry quickly, and that she does not like to be around people as they make her nervous.  (R. 480-82).  Plaintiff takes medication for her emotional problems and goes to therapy at Southwestern Indiana Mental Health Center approximately every six weeks.  At one point, she tried group anxiety meetings but stopped going because it was hard for her to tell her story to other people.  (R. 482).

At several points in the hearing, Plaintiff had difficulty remembering and recalling details when the ALJ and her attorney examined her.  (R. 471-73, 479, 487).  Plaintiff's family no longer allows her to use the gas stove because she frequently forgot to turn it off, putting her family in danger.  She further testified that sometimes while washing dishes she forgets to turn the water off as well. (R. 489-90).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits.  *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, a plaintiff must establish that he or she suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

### V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through March 31, 2010; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date.  (R. 11).  The ALJ found that, in accordance with 20 C.F.R. §

404.1520, Plaintiff had four impairments that are classified as severe:  residuals of left shoulder injury, affective disorder (schizoaffective); organic mental disorder; and obesity.  (R. 11).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 12).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible.  (R. 16).  Consequently, the ALJ concluded that Plaintiff retained the RFC for a limited range of light work that included:  occasionally lifting ten pounds with the left upper extremity; no climbing of ropes, ladders, or scaffolds; occasionally crawling; avoiding repetitive overhead use of the left upper extremity; she can complete simple repetitive tasks; requires an at-will sit/stand option; and can have occasional contact with co-workers, supervisors, and the general public.  (R. 13).  The ALJ opined that Plaintiff could not perform her past work.  (R. 18).  However, the ALJ opined that Plaintiff retained the RFC for a significant number of jobs in the regional economy.  (R. 18).  The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 19).

## VI.  Issues

Plaintiff has raised two issues.  The issues are as follows:

1.  Whether the ALJ should have given controlling weight to the opinions of Plaintiff's treating and examining physicians, and whether the ALJ failed to consider evidence favorable to Plaintiff.

2.  Whether the ALJ failed to consider the cumulative effects of Plaintiff's medications.

**Issue 1:      Whether the ALJ should have given controlling weight to the opinions of Plaintiff's treating and examining physicians, and whether the ALJ failed to consider evidence favorable to Plaintiff.**

Plaintiff argues that the ALJ should have given controlling weight to the opinions of her treating/examining physicians.  Opinions of a treating physician are generally entitled to controlling weight.  *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d)  *How we weigh medical opinions.*  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1)  *Examining relationship.*  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2)  *Treatment relationship.*  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual

examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  *Nature and extent of the treatment relationship.*  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3)  *Supportability.*  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the

weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4)  *Consistency.*  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5)  *Specialization.*  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6)  *Other factors.*  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

*****

(f)  *Opinions of nonexamining sources.*  We consider all evidence from nonexamining sources to be opinion evidence.  When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section.  In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

(1)  In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and

severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity.  These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

Plaintiff specifically alleges that the ALJ failed to give proper weight to the opinions of Dr. Brake, Dr. Crowley, and Dr. Griffith concerning her physical impairments, as well as the opinions of Dr. Wuertz concerning her mental impairments.  In this case, the ALJ did not specifically address the evaluations of Dr. Brake, Dr. Crowley, and Dr. Griffith.  However, those three doctors mostly noted problems with Plaintiff's range of motion in her left shoulder.  The doctors did not specifically opine that Plaintiff was limited beyond the level noted by the ALJ.  In fact, the ALJ specifically found that Plaintiff's RFC was substantially limited; the ALJ found that Plaintiff could only occasionally lift ten pounds with her left arm and could have no repetitive overhead use of her left arm.  Thus, the ALJ clearly took into consideration Plaintiff's left shoulder impairment and reasonably limited Plaintiff's RFC.

Despite a two-year treatment relationship with Dr. Wuertz and the Southwestern Indiana Mental Health Center, the ALJ did not analyze, and in fact, did not even mention the opinions expressed by Dr. Wuertz.  The opinions of Dr. Wuertz suggest that Plaintiff suffered from major depressive disorder, recurrent, with psychotic features, panic disorder with agoraphobia, and anxiety disorder; he

-19-

also assigned a GAF score of 35.  (R. 119-20).  Throughout Plaintiff's treatment with Dr. Wuertz, she reported hearing voices, contemplating suicide, having paranoid thoughts, depression, and severe anxiety.  Plaintiff's GAF score of 35 indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  This extremely low GAF score in combination with findings that Plaintiff has paranoid thoughts, delusions, and severe anxiety/depression calls into question whether or not Plaintiff has the RFC to perform any jobs.  And, it is completely in line with the even lower GAF score of 30 provided by state agency psychologist Dr. Baker who, upon examination of Plaintiff, found similar mental problems.  What is especially problematic about the ALJ's decision is that he granted "Dr. Baker's assessment of the claimant's mental abilities little weight," while not even addressing the similar opinions of Plaintiff's own treating physician Dr. Wuertz.  (R. 16).  There does not appear to be any objective medical evidence from a treating or examining pshycologist that contradicts the opinions of Dr. Wuertz and Dr. Baker.

The court concludes that the ALJ neglected to discuss opinions from a treating physician that were consistent with other objective medical evidence in the record from Dr. Baker.  The court, therefore, cannot trace the path of the ALJ's reasoning regarding Plaintiff's mental impairments.  This matter must be

**remanded** to address Plaintiff's treatment by Dr. Wuertz and Southwestern Indiana Mental Health Center.

**Issue 2:      Whether the ALJ failed to consider the cumulative effects of Plaintiff's medications.**

Plaintiff also argues that the ALJ disregarded evidence that suggested that Plaintiff's medications left her feeling sedated.  However, the evidence reveals that in October 2006, Plaintiff was feeling sedated from medication and that Dr. Wuertz changed her medication.  (R. 118).  The evidence does not reveal that Plaintiff ever complained to Dr. Wuertz again about changing medication.  There is a mention in Dr. Baird's notes from October 2007 that Seroquel prescribed by Dr. Wuertz made Plaintiff feel too sedated.  (R. 233).  However, the note specifically indicated that Dr. Wuertz did not feel that an adjustment to Plaintiff's Seroquel was necessary.  In fact, one month later in November 2007, Dr. Wuertz actually increased Plaintiff's Seroquel dosage.  (R. 114).  While it does not appear that Plaintiff was consistently hampered by feelings of sedation, the ALJ's duty in evaluating an individual's complaints is to consider many factors, including the side effects of medication.  20 C.F.R. § 404.1529(c)(3).  On remand, the ALJ should address whether or not Plaintiff's allegations of sedation are credible and whether or not this has any effect on Plaintiff's RFC.

### VII.  Conclusion

For the reasons discussed above, the court cannot trace the path of the ALJ's reasoning.  The ALJ failed to consider the opinions of Plaintiff's treating

psychologist, Dr. Wuertz.  The ALJ also did not consider the effects of Plaintiff's

medications.  The decision of the Commissioner is, therefore, **REMANDED**.

      **SO ORDERED.**

**Dated:**  September 18, 2009

                                                    William G. Hussmann, Jr.
                                                    United States Magistrate Judge
                                                    Southern District of Indiana

**<u>Electronic copies to</u>:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

John Ryan Worman
WOODS & WOODS, LLP
jworman@woodslawyers.com